UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS SMITH,                              Case No. 13-12759

                    Plaintiff,             David M. Lawson
v.                                         United States District Judge

COMMISSIONER OF SOCIAL SECURITY,           Michael Hluchaniuk
                                           United States Magistrate Judge

                    Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 17, 18)**

## I.    PROCEDURAL HISTORY

### A.    Proceedings in this Court

On June 21, 2013, plaintiff Curtis Smith filed the instant suit seeking

judicial review of the Commissioner's unfavorable decision disallowing benefits.

(Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), District

Judge David M. Lawson referred this matter to the undersigned for the purpose of

reviewing the Commissioner's decision denying plaintiff's claim for disability and

disability insurance benefits.  (Dkt. 4).  This matter is before the Court on cross-

motions for summary judgment.  (Dkt. 17, 18).

### B.    Administrative Proceedings

Plaintiff filed the instant claim for disability and disability insurance

benefits (DIB) on May 28, 2010, alleging that he became disabled beginning March 21, 2009. (Dkt. 13-5, Pg ID 200-01). The claim was initially disapproved by the Commissioner on September 23, 2010. (Dkt. 13-3, Pg ID 157). Plaintiff requested a hearing and on October 3, 2011, plaintiff appeared, with counsel, before Administrative Law Judge (ALJ) Michael S. Condon, who considered the case de novo. (Dkt. 13-2, Pg ID 75-124). In a decision dated November 22, 2011, the ALJ found that plaintiff was not disabled. (Dkt. 13-2, Pg ID 58-70). Plaintiff requested a review of this decision on December 2, 2011. (Dkt. 13-2, Pg ID 52). The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on April 26, 2013, denied plaintiff's request for review. (Dkt. 13-2, Pg ID 43-46); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    FACTUAL BACKGROUND

### A.    ALJ Findings

Plaintiff, born in 1961, was 47 years of age on the alleged disability onset date and 48 years old on the date last insured, September 30, 2010. (Dkt. 13-2, Pg

ID 69).  Plaintiff had past relevant work experience as a paint mixer, a gutter installer, and a siding installer.  (Dkt. 13-2, Pg ID 68-69).  The ALJ applied the five-step disability analysis to plaintiff's claim and found at step one that plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date through his date last insured.  (Dkt. 13-2, Pg ID 60).  At step two, the ALJ found that plaintiff's Marfan's syndrome, status-post aortic aneurysm repair (2006), degenerative disc disease of the lumbar spine, lumbar spondylosis, status-post right rotator cuff repair surgery (September 2009), status-post clavicle resection, a major depressive disorder, a learning disorder, NOS, and an alcohol abuse disorder were "severe" within the meaning of the second sequential step, and that plaintiff's emphysema, borderline intellectual functioning, carpal tunnel syndrome, and alleged illiteracy were not severe.  (Dkt. 13-2, Pg ID 60-62).  At step three, the ALJ found no evidence that plaintiff's combination of impairments met or equaled one of the listings in the regulations.  (Dkt. 13-2, Pg ID 62-63).

The ALJ determined that plaintiff has the following residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a).  He could stand and walk for up to two hours total in an eight-hour workday and sit for up to six hours total in an eight-hour workday.  The claimant could never reach overhead with his right upper extremity.  He could occasionally climb ramps and stairs, stoop, and crouch.  He could never climb ladders, ropes

> or scaffolds, kneel, or crawl.  He could frequently
> balance.  He could do no reading or writing on the job.
> The claimant was limited to performing simple, routine,
> and repetitive tasks involving no fast-paced production
> quotas and only simple work-related decisions.  He could
> have only occasional interaction with the public,
> coworkers, and supervisors.

(Dkt. 13-2, Pg ID 63-68).  At step four, the ALJ found that plaintiff was unable to

perform his past relevant work, because the exertional demands of those positions

exceeded plaintiff's RFC.  (Dkt. 13-2, Pg ID 68-69).  At step five, the ALJ denied

plaintiff benefits because he could perform a significant number of jobs available

in the national economy.  (Dkt. 13-2, Pg ID 69-70).

## B.    Plaintiff's Claims of Error

Plaintiff first argues that the ALJ erred in giving the opinion of plaintiff's

treating psychiatrist, Dr. Mohammad Jafferany, little weight.  Plaintiff states that

the ALJ gave Dr. Jafferany's opinion little weight because "form reports in which

a doctor's obligation is only to check a box, without explanation of the doctor's

medical conclusions, are weak evidence at best," and because Dr. Jafferany's

opinion "is inconsistent with the claimant's lack of treatment until August 2010

and the generally unremarkable mental status examinations."  (Tr. 25).  Plaintiff

responds that the format of Dr. Jafferany's opinion is irrelevant to the assessment

of the opinion, as the format of the assessment is not a factor the adjudicator is to

take into account pursuant to 20 C.F.R. § 404.1527(d).  Plaintiff further asserts

4

that plaintiff is a Medicaid patient, treated at a rural county's psychiatric clinic, and psychiatrists at such clinics do not have the luxury of producing elegant, flowing, multi-page assessments.  Plaintiff contends that the specific form used by Dr. Jafferany was created by the Social Security Administration, and there is nothing unreliable or suspect in the use of such a form.

Plaintiff asserts that Dr. Jafferany's August 15, 2011 assessment noted marked limitations in following work rules, relating to co-workers, dealing with the public, interacting with supervisors, using judgment, dealing with work stresses, and maintaining attention/concentration, noted moderate limitations in functioning independently, noted marked limitations in demonstrating reliability, and noted moderate limitations in relating predictably in social situations.  Dr. Jafferany indicated extreme limitations with difficulties in maintaining concentration, persistence, or pace and marked limitations with difficulties in maintaining social functioning.  (Tr. 489-91).  Plaintiff states that the ALJ must give the medical opinion of a treating source controlling weight if the opinion is well-supported by medically acceptable clinical techniques and not inconsistent with the other substantial evidence.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

Plaintiff argues that the ALJ failed to give "good reasons" for rejecting the opinions of Dr. Jafferany.  First, plaintiff contends, the finding that Dr. Jafferany's

opinions are "inconsistent with the claimant's lack of treatment until August 2010"

is a *non sequituur*, because treatment for a psychiatric condition has to begin at

some point, and failure to receive treatment for mental problems may be a

symptom of a mental disorder, citing *White v. Commissioner of Social Security*,

572 F.3d 272 (6th Cir. 2009). Plaintiff also asserts that Dr. Jafferany's assessment

is consistent with the global assessment of functions (GAF) scores in plaintiff's

treatment record. On August 11, 2010, plaintiff's GAF score was 45 (Tr. 543-44),

and plaintiff also had a GAF score of 45 on September 17, 2010 (Tr. 556-57) and

April 13, 2011 (Tr. 514). A GAF score of 50 or below indicates markedly

impaired functioning in a school or work setting. Plaintiff further argues that,

contrary to the ALJ's determination, Dr. Jafferany's opinions are not inconsistent

with his mental status examinations, in which he reported trouble with getting to

sleep due to worrying about everything, a lack of energy, anger problems, not

liking himself or others, and that his mood was depressed and anxious, his

judgment and insight were fair, his affect was bland, and he was diagnosed with

major depressive disorder, recurrent, moderate; alcohol abuse; and learning

disorder NOS. (Tr. 25, 501-05, 514, 535-45, 555-57, 563, 565, 567-68, 570-71,

575-76).

Plaintiff continues that if the ALJ declines to give a treating source's

opinion controlling weight, he must then balance the factors set forth in 20 C.F.R.

6

§ 1527(c)(2)(I) and (ii) and (c)(3) through (6) to determine what weight to give the opinions. *Wilson*, 378 F.3d at 544. Plaintiff asserts that Dr. Jafferany is a psychiatrist and thus a specialist who has treated plaintiff on a regular and continuing basis from October 2010 through the date of the hearing (Tr. 499-577), and the reasons given in the ALJ's decision for giving "little weight" to Dr. Jafferany's opinions are contrary to the regulations and not supported by substantial evidence of record.

Plaintiff argues, for his second claim of error, that the ALJ erred in failing to find that plaintiff's mild mental retardation and other physical and mental work limitations met Listing 12.05C. Listing 12.05C states that an individual meets the listing if he has an IQ between 60 and 70 and a physical or other mental impairment which imposes an additional and significant work-related limitation of function. Plaintiff contends that the ALJ's decision failed to make this determination. Plaintiff asserts that the ALJ apparently found that plaintiff's IQ score was higher than 67, and also discussed a verbal IQ score of 67-73 when plaintiff was 16, but found that "[t]his does not satisfy the listing criteria for 12.05C because the score is a range instead of a singular value." (Tr. 19). Plaintiff contends that the ALJ decision failed to make the critical finding of whether plaintiff's IQ score was 70 and below or 71 and above. Plaintiff asserts that consulting evaluator Dr. Brady found plaintiff's IQ to be 67 (Tr. 480-84), and

7

that the ALJ found plaintiff to have the severe impairments of Marfan's syndrome, status post aortic aneurysm repair, degenerative disc disease of the lumbar spine, lumbar spondylosis, status post right rotator cuff repair surgery, status post clavicle resection, major depressive disorder, learning disorder, and alcohol abuse disorder.  (Tr. 18).  Also, Dr. Jafferany found plaintiff's mental impairments to significantly impair his functioning.  (Tr. 489-91).  Thus, plaintiff concludes, he had both significant physical and other mental impairments, each of which imposed significant work related limitation of function, and that these additional limitations, in addition to an IQ of 67, would satisfy Listing 12.05C.

Plaintiff continues that Listing 12.05C defines mental retardation as "significantly subaverage intellectual functioning with deficits in adaptive behavior initially manifested during the development period (before age 22)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  A May 11, 1981 psychological reevaluation of plaintiff (when he was 19 years, 6 months old, in the 12th grade) indicated that plaintiff was within the borderline range of intellectual functioning with "overall reading score at the late first grade level" (Tr. 432), which plaintiff asserts demonstrates that his condition manifested before age 22.  Plaintiff notes that the consultative examiner found plaintiff had a full-scale IQ of 67, but also noted that plaintiff's motivation was poor and he likely would have scored higher if he put forth more effort.  (Tr. 19).  Plaintiff complains that the ALJ's decision

8

failed to address whether plaintiff's putative score would be below 70, and thus still satisfying 12.05C, or higher. *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268 (6th Cir. 1991) ("We also note that the Secretary could have administered a second I.Q. test were he certain of the invalidity of Mr. Brown's scores. He did not."). Plaintiff complains that the ALJ instead cherry-picked higher IQ scores from a 1978 IQ test (noting a full scale IQ of 80-86), and that the school IQ tests are not substantial evidence of plaintiff's IQ at the time of the hearing. In any event, plaintiff argues that plaintiff's verbal IQ scores in the 1976 test "fell within the Borderline range of scores (67-73)." (Tr. 433). Plaintiff also asserts that the ALJ decision failed to note plaintiff's IQ of 68 in 1975 using the Slosson IQ test (Tr. 434), and that the ALJ's findings that cognitive testing and plaintiff's appearance at the hearing suggests his mental functioning is in the average to low average range is not substantial evidence to support a conclusion that plaintiff's IQ was over or under 70.

Plaintiff notes that the ALJ also found that plaintiff did not have adaptive functioning deficits required by 12.05C, citing semi-skilled work and the ability to drive, cook simple meals, and shop. (Tr. 19). Plaintiff disputes that his past work installing siding and gutters was properly classified as semi-skilled, citing his limited earnings from 2002 through 2006 and unsuccessful work history. Plaintiff also disputes that his ability to drive, cook simple meals and shop supports an

absence of deficits in adaptive functioning, citing *Brown v. Secretary of Health & Human Services*, 948 F.2d 268 (6th Cir. 1991), as holding that the ability to use public transit, make change in a grocery store, do his own laundry, use a drivers' license, and follow a road atlas were not inconsistent with a valid IQ test of 68.

For his third and final claim of error, plaintiff argues that the ALJ erred in failing to find plaintiff to be disabled under Medical Vocational Rule 201.17. Plaintiff asserts that he was 48 years old on his date last insured, and the Medical Vocational Rule 201.17 indicates that a younger individual of ages 45-49 who is illiterate with an unskilled work history who is limited to sedentary work is disabled. Plaintiff contends that his prior work as a siding installer and a production worker did not require any reading or writing (Tr. 173-74), and that contrary to the ALJ's finding, he never actually performed that work at a semi-skilled level. The ALJ noted that the prior March 24, 2009 ALJ decision found that plaintiff was not illiterate and that he was bound by that finding. (Tr. 19-20). Plaintiff argues, however, that the prior adjudication is suspect and should not be given controlling weight because the prior ALJ found plaintiff to be literate based solely on the basis that "claimant has a driver's license and would have had to pass a test in order to obtain his license" (Tr. 93), which plaintiff asserts is sheer speculation as there is no mention of any evidence of how plaintiff was able to receive a license. According to plaintiff, as noted in *Skinner v. Secretary of*

10

*Health & Human Services*, 902 F.2d 447 (6th Cir. 1990), the written portion of a driver's license exam can be administered orally. The prior ALJ decision also noted that plaintiff did not mention illiteracy in his application (Tr. 93), which plaintiff asserts has no probative value since it assumes an illiterate person would understand that the Social Security regulations consider illiteracy as a relevant factor.

Plaintiff argues that neither the prior ALJ decision nor the current decision provide any basis for finding plaintiff to be literate, and that the Commissioner was required to find plaintiff illiterate where achievement testing demonstrated that plaintiff read below a third grade level despite plaintiff's completion of a formal eighth grade education, citing *Skinner*, 902 F.2d at 449-50. According to plaintiff, the TBHS individual person-centered plan dated August 20, 2010 indicated that plaintiff "was forthcoming that he was unable to read, which caused him significant shame" (Tr. 551), and Dr. Brady's consultative examination report dated September 8, 2010 noted that plaintiff had a feeling of worthlessness because he cannot read or write. (Tr. 480). Further, plaintiff testified at the hearing that he cannot read a newspaper, that he can only read two and three letter words, that his wife filled out all of the Social Security forms for him, and that he was unable to keep a job at a bakery because he could not read the recipes. (Tr. 38-39, 63). Plaintiff contends that the ALJ did not find this testimony credible,

11

stating "[t]here is certainly nothing that has happened that would make one conclude that [plaintiff's] reading and writing ability is worse than it was at the time of the prior determination."  (Tr. 20).  Plaintiff counters that there was no psychiatric diagnosis at the time of the prior decision, and that he now has been diagnosed with major depressive disorder, recurrent, and learning disorder NOS, with a GAF of 45.  (Tr. 555-57).  Plaintiff contends that a major depressive disorder would impact his cognition and comprehension, given that his early reading level was extremely marginal, and that the ALJ failed to cite any evidence to support his lay conclusion that a significant depressive disorder could not further impair plaintiff's ability to read.

Plaintiff further argues, for purposes of res judicata, that the prior decision did not address the issue of Medical Vocational Rule 201.17, but only addressed plaintiff's ability to read or write in terms of whether the condition was a severe impairment.  (Tr. 93).  Thus, plaintiff concludes, res judicata was improperly applied by the ALJ here because the determination of plaintiff's literacy in the prior decision was not "pertinent to the same issue;" here, the applicability of a Medical Vocational Rule.  "Illiteracy" is the inability to read or write a simple message such as instructions or an inventory list.  20 C.F.R. § 404.1564(b)(1). Plaintiff argues that the ALJ's RFC determination that includes "no reading or writing" is, in fact, a finding of illiteracy, and had the ALJ found plaintiff's

abilities to be functionally equivalent to being illiterate, the application of Medical

Vocational Rule 201.17 would direct a finding of disabled. Plaintiff therefore asks

the Court to reverse the decision of the Appeals Council and the ALJ and remand

this matter for an award of benefits or, in the alternative, remand this matter for

further proceedings.

### C.    Commissioner's Motion for Summary Judgment

The Commissioner first argues that the ALJ provided "good reasons" to

reject the conclusions on Dr. Jafferany's form.  The Commissioner notes that

plaintiff criticized the ALJ for failing to address the length of the treatment

relationship, the frequency of examination, or the nature and extent of the

relationship that he had with Dr. Jefferany.  The Commissioner argues that

plaintiff, however, did not seem to realize that as of his date last insured,

September 30, 2010, Dr. Jefferany did not have a treating relationship with

plaintiff.  Indeed, as of that date, Dr. Jefferany had seen plaintiff once, for an

initial evaluation.  (Tr. 555-57).  The Commissioner argues that as the ALJ

concluded his inquiry with plaintiff's date last insured, there was no treatment

relationship for the ALJ to evaluate. According to plaintiff, Dr. Jefferany "treated

(him) on a regular and continuing basis from October 2010 through the date of the

ALJ hearing, October 3, 2011." (Dkt. 17, Pg ID 647-48).  Thus, the Commissioner

contends, even plaintiff, at least in that statement, appears to realize that Dr.

Jefferany's treatment occurred after plaintiff's date last insured.

Further, although plaintiff asserted that Dr. Jefferany provided regular and continuing treatment between October 2010 and October 2011, and cited transcript pages 499-577 in support, the Commissioner argues that many of the medical records found on those pages are from social workers, Alexis Hight (Tr. 499-501, 503, 504, 506), Deb Geno (Tr. 507, 510-11, 513, 562-66), Cynthia Bulitz (Tr. 508, 561), and Bruce McGhee (Tr. 510, 516, 517, 518, 520, 521, 522, 567-69, 571-73, 576-77). The Commissioner also notes that the document found at Tr. 527-30 is a letter from Mr. Smith's representative, and the document at Tr. 531-34 is a health history questionnaire that either plaintiff or someone helping him filled out on August 10, 2010. Similarly, an Outpatient Psychosocial History was also signed by plaintiff and dated August 10, 2011 (Tr. 535-42). Thus, the Commissioner concludes, contrary to plaintiff's assertion, the majority of the records found in the pages he selected are not from Dr. Jefferany.

The Commissioner contends, in addition, plaintiff engaged in a very selective view of the record in his attempt to demonstrate that the ALJ erred when he stated that the limitations Dr. Jefferany set out on the form were inconsistent with generally unremarkable mental status examinations. (Tr. 25). For example, plaintiff cited a progress note from October 29, 2010, to demonstrate a bland affect. (Tr. 501). However, Alexis Hight, the social worker who submitted that

14

report, also stated that plaintiff's appearance was appropriate, as was his affect, and she described plaintiff's mood as relaxed and his rapport as cooperative.  (*Id.*). In the narrative portion of this progress note, Ms. Hight reported that plaintiff remained active in his wife's catering business, and that plaintiff advised that he had significantly cut down on his drinking and reported that he was sleeping better, and Ms. Hight noted that plaintiff appeared more self-confident at this session. (*Id.*).

The Commissioner further argues that when the ALJ assigned little weight to Dr. Jefferany's opinion, he observed that this opinion consisted of a check-the-box form, and also commented that such evidence offered little in the way of explanation and, therefore constituted weak evidence. (Tr. 25). Plaintiff criticized these statements and asserted that the format of the assessment should not be taken into account when an ALJ assesses a physician opinion.  The Commissioner counters that 20 C.F.R. § 1527(d) explains that the better the explanation provided, the more weight the agency or the adjudicator will assign that opinion. The Commissioner asserts that the converse is also true, and when an opinion, like Dr. Jefferany's opinion, lacks explanation it is entitled to little, if any, weight. The Commissioner argues therefore that the ALJ did not err when he assigned little weight to Dr. Jefferany's poorly explained opinions.  According to the Commissioner, the ALJ also assigned Dr. Jefferany's opinion little weight because

it concerned a mental impairment, and plaintiff, despite alleging disability since April 2006, did not seek mental health treatment until August 2010. The Commissioner notes that plaintiff criticized the ALJ's statement as a *non sequitur*, and offered that mental health treatment has to start sometime. The Commissioner acknowledges that this is true, but argues that in this instance, plaintiff's mental health treatment occurred in the context of a person alleging disability as of April 2006, and having to prove disability by September 30, 2010. Thus, plaintiff, who had to prove disability between April 2006 and September 2010, relied heavily on a document submitted in August 2011--more than a year after the expiration of his insured status--by a doctor who saw plaintiff once during the period at issue. In this context, the Commissioner concludes, the ALJ's observation about plaintiff's minimal mental health treatment during the period at issue is relevant, and the ALJ provided a number of good reasons for assigning little weight to Dr. Jefferany's form.

The Commissioner next argues that plaintiff cannot carry his burden of showing that he meets or equals the requirements of Listing 12.05C, noting that in order to meet the requirements of a listed impairment, the claimant must meet *all* of the elements of that listing. *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987). Listing 12.05 (mental retardation) refers to significantly sub-average general functioning with deficits in adaptive functioning

16

initially manifested during the developmental period; i.e., the evidence supports

onset prior to age 22.  The listing further explains that the required level of

severity is met when the requirements of sections A,B,C or D are satisfied. Section

C of Listing 12.05 explains that the claimant can meet the requirements by

presenting a valid verbal, performance, or full-scale IQ score between 60 and 70

and a physical or other mental impairment that imposes an additional and

significant work-related limitation on functioning .  Thus, in order to meet or equal

the requirements of Listing 12.05, an individual's impairment must satisfy both the

diagnostic description in the introductory paragraph and one of the four sets of

criteria in the subparagraphs A through D.  The Sixth Circuit has recognized that

claimants must satisfy the diagnostic description (in other words, the claimant has

to show that he is mentally retarded).  *See Foster v. Halter*, 279 F.3d 348, 354 (6th

Cir. 2001). Thus, Listing 12.05 requires, as an initial matter, that a claimant

establish mental retardation. *See* 71 Fed. Reg. 10419-01, 10423, 2006 WL 467856

(Mar. 1, 2006) ("([Y]ou must have mental retardation that satisfies the criteria in

the introductory paragraph . . . in addition to the criteria in of the paragraphs that

follows the capsule definition").

The Commissioner argues that plaintiff cannot cite to a single instance in

this record where any treating professional referred to him as mentally retarded.

Dr. Brady, who reported a full-scale intelligence quotient of 67, also reported that

17

plaintiff put forward a poor effort and that his scores would have been higher had he put forth a better effort. (Tr. 483). Dr. Brady diagnosed a learning disorder. (Tr. 484). Dr. Jefferany similarly did not see plaintiff as mentally retarded, but instead reported that plaintiff's fund of knowledge and cognitive abilities appeared to be slightly below average. (Tr. 556). The Commissioner thus concludes that plaintiff cannot meet or equal the requirements of Listing 12.05(C) because he is not mentally retarded.

The Commissioner notes that plaintiff attempts to demonstrate that he had the adaptive deficits required by Listing 12.05(C) and that he questions the vocational expert's analysis that identified two of plaintiff's past jobs as semi-skilled. The Commissioner argues however, as discussed above, that there is no good reason to question the vocational analysis of the vocational expert. The vocational expert not only reviewed plaintiff's work history prior to the hearing and prepared a summary (Tr. 245), but he also sat through the hearing, listened to plaintiff's testimony, and then testified that plaintiff had performed semi-skilled work. (Tr. 71). Although plaintiff's representative cross-examined the vocational expert, he did not ask any questions about the classification of plaintiff's past jobs. The Commissioner concludes that there is no good reason at this late date to question the vocational expert's classification of two of plaintiff's past jobs as semi-skilled jobs.

18

The Commissioner further argues that plaintiff's other challenges to the ALJ's finding of a lack of adaptive deficits are also unavailing. Plaintiff ignored that his history also consisted of service in the National Guard, where he drove a dump truck apparently without difficulty. (Tr. 39). Although plaintiff attempted to downplay the extent of his driving in his brief, he ignored that he drove 75 miles to the hearing, and he also used his driving abilities to help his spouse in her catering business. (Tr. 48, 501). The Commissioner concludes that plaintiff therefore cannot meet or equal the requirements of Listing 12.05(C).

Third, the Commissioner argues that Medical-Vocational Rule 201.17 is not applicable in this case. On March 24, 2009, an ALJ found plaintiff not disabled because he could perform a significant number of sedentary jobs. (Tr. 86-96). That ALJ applied Grid Rule 201.20 as a framework for decision-making and found that plaintiff was a younger individual, who had a high school education and could communicate in English. (Tr. 94). That ALJ also found that plaintiff performed semi-skilled work. (*Id.*). The Commissioner contends that the ALJ who issued the decision under review here, determined that he was bound by the previous decision under *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), and also applied Grid Rule 201.20 as a framework. (Tr. 27). Plaintiff argued that the ALJ should have applied Grid Rule 201.17, a rule that applies to persons who are illiterate and who performed unskilled work. The Commissioner

19

argues, however that she has already discussed why the ALJ, based on vocational expert review and testimony, correctly found that plaintiff performed semi-skilled work. Thus, Grid rule 201.17 does not apply to plaintiff because he performed semi-skilled work.

The Commissioner notes that plaintiff also argued that he should have been found illiterate and that the previous ALJ decision (from March 2009) "is suspect and should not be given controlling weight." (Dkt. 17, Pg ID 654). Plaintiff, however, did not challenge that decision. Instead, he filed a new application on May 28, 2010. Thus, the Commissioner explains, the time to challenge the previous decision is well past. In addition, the soundness of that decision is evident from the challenges that plaintiff has raised to the current decision. The Commissioner asserts that when plaintiff initially applied for benefits in April 2006, he was more than four years away from seeking mental health treatment. Thus, in his initial application, he based his assertions of disability solely on physical impairments. In March 2009, an ALJ found him not disabled based on that application. (Tr. 86-96). In the brief he submitted based on his May 28, 2010 application, plaintiff now argues that he was disabled based almost entirely due to mental impairments. Thus, according to the Commissioner, plaintiff all but acknowledged that the previous ALJ decision correctly found him not disabled based on his physical impairments. The Commissioner contends therefore that

20

plaintiff's own actions demonstrate that the March 2009 ALJ decision is a well-supported decision.

The Commissioner continues, finally, that plaintiff's argument that asked the court to apply a different Grid rule is nothing more than an attempt to ask the court to re-weigh the evidence. Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision, and whether there is substantial evidence in the record to support his findings. 42 U.S.C. § 405(g); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner argues that an ALJ correctly applied Grid rule 201.20 in 2009, and the current ALJ correctly applied that Grid rule again in November 2011. Because Grid rule 201.20 accurately described plaintiff, the Commissioner asserts that the court should resist his invitation to re-weigh the evidence.

## III.   DISCUSSION

### A.   Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and

21

finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the

22

claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

23

The scope of this Court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### B.   Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord*, *Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability

Insurance Benefits Program (DIB) of Title II (42 U.S.C. §§ 401 *et seq*.) and the

Supplemental Security Income Program (SSI) of Title XVI (42 U.S.C. §§ 1381 *et*

*seq*.).  Title II benefits are available to qualifying wage earners who become

disabled prior to the expiration of their insured status; Title XVI benefits are

available to poverty stricken adults and children who become disabled.  F. Bloch,

Federal Disability Law and Practice § 1.1 (1984).  While the two programs have

different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a)

(SSI).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in
> substantial gainful activity, benefits are denied without
> further analysis.
>
> Step Two:  If the claimant does not have a severe
> impairment or combination of impairments, that
> "significantly limits ... physical or mental ability to do

basic work activities," benefits are denied without
further analysis.

Step Three:  If plaintiff is not performing substantial
gainful activity, has a severe impairment that is expected
to last for at least twelve months, and the severe
impairment meets or equals one of the impairments listed
in the regulations, the claimant is conclusively presumed
to be disabled regardless of age, education or work
experience.

Step Four:  If the claimant is able to perform his or her
past relevant work, benefits are denied without further
analysis.

Step Five: Even if the claimant is unable to perform his
or her past relevant work, if other work exists in the
national economy that plaintiff can perform, in view of
his or her age, education, and work experience, benefits
are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing,

20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner

makes a dispositive finding at any point in the five-step process, the review

terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by her impairments and the fact that she is

precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited

with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step

without a finding that the claimant is not disabled, the burden transfers to the

26

Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

At the fifth step, the Commissioner is required to show that "other jobs in

significant numbers exist in the national economy that [claimant] could perform

given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at

241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the

decision must be affirmed even if the court would have decided the matter

differently and even where substantial evidence supports the opposite conclusion.

*McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.  In other words, where

substantial evidence supports the ALJ's decision, it must be upheld.

### C.    Analysis and Conclusions

#### 1.    Treating Physician Opinion

Plaintiff complains that the ALJ violated the treating physician rule in

evaluating the medical source opinion of his treating psychiatrist, Dr. Jafferany.

The ALJ here stated:

> In August 2011, the claimant's mental health provider
> from Tuscola Behavioral Health Services, Mohammad
> Jafferany, M.D., completed a check-the-box opinion.  In
> it, he opined that the claimant had extreme difficulties in
> maintaining concentration, persistence, or pace.  He
> further opined that the claimant has marked difficulties
> in social functioning, and that the claimant experienced
> one to two episodes of decompensation, each of
> extended duration (10F).  Form reports in which a

27

> doctor's obligation is only to check a box, without
> explanations of the doctor's medical conclusions, are
> weak evidence at best.  Further, this opinion is
> inconsistent with the claimant's lack of treatment until
> August 2010 and the generally unremarkable mental
> status examination.  Accordingly, the undersigned gives
> little weight to this opinion.

(Tr. 25).  As for the other opinion evidence in the record, the ALJ gave significant

weight to the opinions of the State agency consultants, Eric VanderHaagen, D.O.,

and Barbara Jones Smith, Ph.D., and moderate weight to the consultative

examiner, Dr. Michael Brady, Ph.D. (Tr. 25-26).

    As both parties acknowledge, and as the Sixth Circuit recently re-

emphasized, greater deference is generally given to the opinions of treating

medical sources than to the opinions of non-treating medical sources.  *See*

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *see also*

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.2007).  The opinion of

a treating physician is the subject of a special rule: such an opinion must be given

controlling weight if it is well-supported and not inconsistent with the record, and

even if it is not given controlling weight, it is subject to a rebuttable presumption

of deference.  20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Massey v. Comm'r*

*of Soc. Sec.*, 409 Fed. Appx. 917, 921 (6th Cir. 2011) ("[T]he opinion of a treating

physician does not receive controlling weight merely by virtue of the fact that it is

from a treating physician.  Rather, it is accorded controlling weight where it is

28

'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'").  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  However, an opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011) (a physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Rogers*, 486 F.3d at 406 (citing § 404.1527(d)(2)).  Indeed, SSR 82-62 requires that "[t]he explanation of the decision must describe the weight attributed the pertinent medical and non-medical factors in the case and reconcile any significant inconsistencies.  Reasonable inferences may be drawn, but presumptions, speculations and suppositions must not be used."  As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-56 (6th Cir. 2004) (finding the ALJ's

29

failure to make sufficiently clear why he rejected the treating physician's opinion was not harmless error, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion). Thus, "an ALJ's decision must articulate with specificity reasons for the findings and conclusions he makes." *Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428, 1999 WL 96920, at *4 (6th Cir. Feb. 2, 1999).

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the medical opinion is determined by a set of factors that guides the weight given to the medical opinion, including the treatment relationship, supportability, consistency, specialization, and other factors. *See* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 372 (6th Cir. 2006).

The undersigned suggests that the ALJ here gave "good reasons" for affording Dr. Jafferany's August 2011 opinion little weight. He noted that Dr. Jafferany completed a form titled "Medical Provider's Assessment of Ability To Do Mental Work-Related Activities," and found this was "weak evidence at best." (Tr. 25, 489-91). Plaintiff argues that the ALJ improperly commented on the

30

format of Dr. Jafferany's opinion. The doctor's opinion did consist of a "check-the-box" form. However, that form also provided a space for "[r]emarks or additional comments," and invited the provider to attach additional pages if needed. (Tr. 491). Despite this invitation, Dr. Jafferany, however, did not provide any explanation at all for the significant limitations he provided on the form, and instead only indicated elsewhere on the form that plaintiff was so limited "prior to 8/10/2011." (Tr. 25, 489-91). While plaintiff has provided examples of evidence which he states could support Dr. Jafferany's restrictive limitations, the record does not show that Dr. Jafferany relied on this evidence, despite being provided with the space to do so. And, and as discussed more fully below, the record establishes that plaintiff only received minimal mental health treatment before his date last insured, and the treatment received was relatively successful in controlling plaintiff's symptoms. (Tr. 24). As the ALJ properly found, "[f]orm reports in which a doctor's obligation is only to check a box, without explanations of the doctor's medical conclusions, are weak evidence at best." (Tr. 25). In this regard, courts have increasingly questioned the evidentiary value of "multiple choice" opinions forms (like the one completed by Dr. Jafferany) which are not supported by clinical records. As one court observed:

> It does not appear that the Sixth Circuit has directly
> addressed the weight afforded to check-box forms filled
> out by treating physicians; however, other circuit courts

31

and courts within the Sixth Circuit have cast doubt on
the usefulness of such "checkmark" or "multiple choice"
forms when unaccompanied by explanation or
unsupported by physician's notes. *See Larson v. Astrue*,
615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a
check-box form might be weak evidence, the form takes
on greater significance when it is supported by medical
records."); *Batson v. Comm'r of Soc. Sec.*, 359 F.3d
1190, 1195 (9th Cir. 2004) (upholding the ALJ's
discounting of a treating physician's opinion in a check-
list form because "an ALJ may discredit treating
physicians' opinions that are conclusory, brief, and
unsupported by the record as a whole . . . or by objective
medical findings"); *Mason v. Shalala*, 994 F.2d 1058,
1065-66 (3d Cir. 1993) ("Form reports in which a
physician's obligation is only to check a box or fill in a
blank are weak evidence at best . . . where these so-
called reports are unaccompanied by thorough written
reports, their reliability is suspect.") (internal quotations
and citation omitted); *Boley v. Astrue*, No. 11-10896,
2012 WL 680393, at *18 (E.D. Mich. Feb. 10, 2012)
("Dr. Ulano merely checked off boxes on the form to
indicate that [claimant] satisfied the requirements for
listing § 12.05 'personality disorder' and almost satisfied
the listing for § 12.04 'affective disorder' . . . [but] did
not support any of these findings with any evidence in
her treating record or any new observations from more
recent treatments."); *Ahee v. Comm'r of Soc. Sec.*, No.
07-CV-12071, 2008 WL 4377652, at *4 (E.D. Mich.
Sept. 22, 2008) ("The ALJ has discretion to reject a
medical opinion, here a form, when the opinion is not
supported by objective medical evidence.").

*Lane v. Comm'r of Soc. Sec.*, 2013 WL 5428739, at *9 (W.D. Mich. Sept. 26,

2013) (quoting *Doyle v. Comm'r of Soc. Sec.*, 2012 WL 4829434, at *9 (E.D.

Tenn. Sept. 12, 2012), *adopted by* 2012 WL 4829213 (E.D. Tenn. Oct. 10, 2012));

*see also Ashley v. Comm'r of Soc. Sec.*, 2014 WL 1052357, at *8 n.6 (W.D. Mich.

Mar. 19, 2014) ("Courts have increasingly questioned the evidentiary value of

'multiple choice' or 'check-off' opinion forms complet[ed] by treating physicians

which are not []supported by clinical records[.]") (citing *Doyle, supra*); *Hyson v.*

*Comm'r of Soc. Sec.*, 2013 WL 2456378, at *13 (N.D. Ohio June 5, 2013)

(collecting cases which held the ALJ did not err by discounting a physician's

opinion which used a checkbox form unaccompanied by explanation of her

conclusions).  Simply put, it is not improper for the ALJ to consider whether a

physician has identified objective medical findings to support a medical opinion.

*See Price v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009)

("Because Dr. Ashbaugh failed to identify objective medical findings to support

his opinion regarding Price's impairments, the ALJ did not err in discounting his

opinion."); *see also Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (the

ALJ could properly give little evidentiary weight to a treating physician's "check-

off form" of functional limitations which "did not cite clinical test results,

observations or other objective findings").  Absent Dr. Jafferany providing some

explanation for the various severe restrictions which appear on the check box

opinion form, there is no basis for the ALJ (or any subsequent reviewer) to

determine the medical bases for those restrictions.  It is plaintiff's burden to prove

that he suffers from a disabling condition.  Thus, the ALJ could properly discount

Dr. Jafferany's August 2011 opinion as weak evidence which did not cite supporting objective medical evidence. *See Lane*, 2013 WL 5428739, at *9 (ALJ properly rejected treating physician's multiple choice opinion form as weak evidence).

The ALJ further found that Dr. Jafferany's "opinion is inconsistent with the claimant's lack of treatment until August 2010 and the generally unremarkable mental status examinations." (Tr. 25). The ALJ acknowledged that although plaintiff's mood was frequently depressed and anxious, on at least one occasion his mood was relaxed and often his appearance and behavior were appropriate, his insight and judgment were fair, his rapport was cooperative, and he regularly denied suicidal ideation or self-injurious thoughts. (Tr. 24). The Commissioner similarly noted that plaintiff engaged in a very selective view of the record in contrast to the generally unremarkable mental status examinations, noting that the records stated that plaintiff's appearance and affect were appropriate, his mood was relaxed and his rapport was cooperative. (Dkt. 18, Pg ID 675). And, contrary to plaintiff's assertion that the ALJ failed to address the length of the treatment relationship, the frequency of examination or the nature and extent of the treatment relationship, the ALJ noted in his decision that plaintiff only periodically treated with Tuscola Behavioral Health Systems, that the majority of his treatment there occurred after his date last insured, and he received minimal

34

mental health treatment prior to his date last insured.  (Tr. 24).  The ALJ explained that plaintiff has not required any inpatient psychiatric hospitalizations and that his treatment, which included therapy and prescription medications, was relatively successful in controlling his symptoms.  (*Id.*).  Finally, the ALJ noted that plaintiff cancelled or failed to show up for a number of appointments, suggesting that his symptoms were not as severe as he alleged.  (*Id.*).  The Sixth Circuit has held that a claimant's failure to seek mental health treatment "should not be a determinative factor in a credibility assessment" relating to the existence of a mental impairment. *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 846 (6th Cir. 2004).  The ALJ's decision here, however, reflects that he did not treat plaintiff's failure to seek mental health treatment as a "determinative factor" in his disability determination, but rather considered it along with other evidence relating to plaintiff's allegations in finding that plaintiff's mental impairments were not disabling.  Further, the record demonstrates that plaintiff sought treatment for his physical impairments, undermining a claim that he was unable to seek treatment for his mental condition. Accordingly, the undersigned suggests that plaintiff's lack of mental health treatment prior to his date last insured was not a "determinative factor" in the disability determination, but was properly considered by the ALJ.

The ALJ also properly noted that the majority of plaintiff's mental health treatment occurred after his date last insured.  Evidence after the date last insured

is relevant only to the extent that it is probative of the claimant's condition prior to that date. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (per curiam) (holding that a treating physician's opinion, based on a treatment record that began eight months after the date last insured, was not entitled to substantial weight). In *Renfro v. Barnhart*, the Sixth Circuit found that a treating physician's opinion as to a claimant's RFC was not entitled to controlling weight where the treating physician was the claimant's treating physician only after the date last insured and reports from other treating physicians during the relevant time period did not indicate that she was as functionally limited as that found after that date. *Renfro v. Barnhart*, 30 Fed. Appx. 431 (6th Cir. 2002). Additional cases support the holding that evidence issued after a date last insured generally lacks probative value. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (tests from 1981 and 1983 were "minimally probative" of claimant's condition in 1979); *Liebisch v. Sec'y of Health & Human Servs.*, 21 F.3d 428, 1994 WL 108957, at *2 (6th Cir. Mar. 30, 1994) (1990 report was "necessarily less accurate" about claimant's condition from 1985-1989 than it was about her status in 1990); *Weetman v. Sullivan*, 877 F.2d 20, 22 (6th Cir. 1989) (deterioration in the claimant's condition after the period of eligibility is irrelevant). Accordingly, the ALJ's decision is supported by substantial evidence and plaintiff's first claim of error should be denied.

36

## 2.    Listing 12.05(C)

Plaintiff next argues that the ALJ erred in finding that plaintiff did not meet

Listing 12.05(C).  In the third step of the sequential analysis, to determine a

claimant's entitlement to SSI or DIB, it is the claimant's burden to bring forth

evidence to establish that his impairment meets or is medically equivalent to a

listed impairment.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164

(6th Cir. 1987).  In order to meet the requirements of a listed impairment, a

plaintiff bears the burden of proof that *all* of a Listing's criteria are met.  *See*

*Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990); *Duncan v. Sec'y of Health &*

*Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986) (a claimant's impairment must

meet *every element* of a Listing before the Commissioner may conclude that he is

disabled at Step III).  An impairment that manifests only some of the criteria in a

particular Listing, "no matter how severely, does not qualify."  *Zebley*, 493 U.S. at

530.

Listing 12.05 provides the criteria used to determine when "mental

retardation is severe enough to preclude gainful activity."  *Turner v. Comm'r of*

*Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).[1]  To qualify as disabled under

---

[1]In 2013, a revised version of listing 12.05 went into effect which replaced the term "mental retardation" with "intellectual disability."  *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 536 n.1 (6th Cir. 2014).  The substantive components of the listing remained unchanged.  *See Hickel v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 980, 982 n.1 (11th Cir. 2013).  The terms "mental retardation" and "intellectual disability" can be used interchangeably because they refer to the same disorder.  *See Talavera v. Astrue*, 697 F.3d 145, 148 n.2 (2d Cir. 2012).

Listing 12.05, a claimant must satisfy both the diagnostic description in the

introductory paragraph of the Listing and one of the four sets of criteria found in

Subparts A through D.  *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).

Specifically, Listing 12.05(C) requires a claimant to meet three requirements in

order to establish a disability: (1) she must satisfy the introductory paragraph of

Listing 12.05, which requires the showing of significantly subaverage general

intellectual functioning with deficits in adaptive functioning that initially

manifested prior to the age of 22; (2) she must establish that she meets the first

requirement of 12.05(C) by showing that she has a valid verbal, performance or

full-scale IQ score of 60 through 70; and (3) she must establish that she meets the

second requirement of 12.05(C) by showing she has a physical or mental

impairment, other than the mental retardation impairment, that imposes an

additional and significant work-related limitation of function.  20 C.F.R. Pt. 404,

Subpt. P, App. 1, Listing 12.00A, 12.05, 12.05(C); *Foster*, 279 F.3d at 354.  The

Sixth Circuit has described the adaptive skills portion of Listing 12.05 as follows:

> The adaptive skills prong evaluates a claimant's
> effectiveness in such areas as social skills,
> communication skills, and daily-living skills.  To
> determine the definition of mental retardation under the
> SSA, it is appropriate to consult leading professional

However, for the sake of clarity, courts generally use the old terminology when conducting
appellate review of administrative decisions made before the terminology was revised.  *See
Peterson*, 552 Fed. Appx. at 536 n.1; *Hickel*, 539 Fed. Appx. at 982 n.1.

> organizations' definitions.  The American Psychiatric
> Association defines adaptive-skills limitations as
> "[c]oncurrent deficits or impairments . . . in at least two
> of the following areas: communication, self-care, home
> living, social/interpersonal skills, use of community
> resources, self-direction, functional academic skills,
> work, leisure, health, and safety."

*Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 677 (6th Cir. 2009) (internal

citations omitted) (finding plaintiff's adaptive skills were not deficient as she

cared for herself and her husband, cooked, washed clothes, shopped, managed her

finances and used public transportation).

The ALJ here found that plaintiff did not meet the requirements of Listing

12.05(C), explaining:

> In terms of his alleged borderline intellectual
> functioning, the claimant had a full-scale IQ score of 67
> at the psychological consultative examination in
> September 2010.  However, the examiner noted that the
> claimant's motivation was poor.  According to the
> examiner, the claimant would have likely scored higher
> if he had put forth more effort (9F).  Further, the
> claimant's full-scale IQ score was 80-86 when he was 16
> years old (7F/5).  His verbal IQ score was also 67-73
> when he was 16 (7F/5); however, this does not satisfy
> the listing criteria for 12.05C because the score is a range
> instead of a singular value.  Moreover, the claimant does
> not exhibit the deficits in adaptive functioning required
> by the listing.  For example, he has worked semi-skilled
> jobs (10E/2).  He can also drive, prepare simple meals,
> and shop (5E).  Cognitive testing and the claimant's
> appearance at the hearing suggest that his mental
> functioning is in the average to low average range.

(Tr. 19).

The Commissioner points out, and plaintiff does not dispute, that plaintiff cannot cite to a single instance where any treating professional referred to him as mentally retarded.  Instead, plaintiff was diagnosed with a learning disorder by Dr. Brady (Tr. 484), and Dr. Jafferany reported that plaintiff's knowledge and cognitive abilities appeared to be slightly below average.  (Tr. 556).  Further, plaintiff's educational record indicates that plaintiff fell within the borderline range of intelligence.  (Tr. 432).  As the Sixth Circuit recently recognized, "[a]lthough [a mild mental retardation] diagnosis is not a necessary prerequisite to satisfy Listing 12.05, its absence is probative for a 12.05C determination." *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 539 (6th Cir. 2014) (citing *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007)). Plaintiff instead argues that the ALJ failed to make a finding of whether plaintiff's IQ was above or below 70.  However, the ALJ did expressly address plaintiff's IQ scores in finding that plaintiff did not meet or equal Listing 12.05(C).  (Tr. 19). He recognized that Dr. Brady reported a full-scale IQ score of 67, but also reported that plaintiff put forward a poor effort and that his scores would have been higher had he put forth a better effort.  (Tr. 19,  483).  The ALJ also recognized plaintiff's verbal IQ score of 67-73 when he was 16, but found that did not satisfy 12.05(C) because the score was a range instead of a singular value.  (Tr.

40

19, 433).  Even assuming plaintiff's valid IQ scores below 70, the undersigned

notes that a low IQ score, in itself, is not evidence of "subaverage intellectual

functioning or deficits in his adaptive functioning during [plaintiff's]

developmental period."  *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491-

92 (6th Cir. 2010) ("A claimant must produce evidence beyond his present IQ

scores to show that he exhibited deficits during his developmental period.");

*Bailey v. Comm'r of Soc. Sec.*, 2013 WL 2286962 (S.D. Ohio May 23, 2013)

(holding that the ALJ properly evaluated conflicting evidence concerning

plaintiff's IQ scores, with several scores supporting a finding of borderline

intellectual functioning despite additional scores below 70, including one score of

59); *see also Foster*, 279 F.3d at 354-55 (finding that the claimant, who had an IQ

in the high 60s and dropped out of high school after the ninth grade, did not show

significantly subaverage intellectual functioning or adaptive deficits during her

developmental period).

    Here, the ALJ also concluded that plaintiff does not exhibit deficits in

intellectual functioning, noting that plaintiff has worked semi-skilled jobs, can

drive, prepare simple meals and shop, and that cognitive testing and plaintiff's

appearance at the hearing suggest his mental functioning is in the average to low

average range.  (Tr. 19).  Ample case law establishes that where evidence exists

that a plaintiff has been able to live independently and maintain full-time

41

employment for many years, as in this case, an ALJ's decision that a plaintiff does not meet Listing 12.05, based on his level of adaptive functioning, generally will be upheld as supported by substantial evidence. *See Bailey*, 2013 WL 2286962, at *6 (collecting cases); *see also West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312 (1993) and holding that plaintiff, who held a long-term, full-time job, with many activities of daily living, did not show deficiencies in adaptive functioning); *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007) (semiskilled work was inconsistent with Listing 12.05). In *Carter v. Commissioner of Social Security*, 2012 WL 1028105 (W.D. Mich. Mar. 26, 2012), the court determined that the plaintiff did not meet Listing 12.05 criteria despite evidence of attending special education classes, low grades in school, and low IQ scores as a child because the "plaintiff's claim of deficits in adaptive functioning was undermined by her adaptive skills which had allowed her to be employed in unskilled occupations for many years." *Id.* at *6 ("Plaintiff's ability to perform substantial gainful activity is relevant to whether she had the deficits in adaptive functioning necessary to meet listing 12.05's diagnostic description."); *see also Eddy v. Comm'r of Soc. Sec.*, 506 Fed. Appx. 508, 510 (6th Cir. 2012) (fact that the plaintiff attended special education classes and quit school after the eighth grade was found "insufficient to undermine the ALJ's conclusion that she did not meet the regulatory listing for

42

mental retardation because [the plaintiff] did not show that her enrollment in special education classes or her failure to continue her schooling were due to her having significantly subaverage general intellectual functioning"). Although plaintiff questions the vocational expert's analysis that identified two of plaintiff's past jobs as semi-skilled, he has not provided any valid reason that the vocational expert's was in error. The vocational expert reviewed plaintiff's work history prior to the hearing and also listened to plaintiff's hearing testimony prior to classifying plaintiff's past work as semi-skilled. (Tr. 71, 245). Plaintiff's attorney questioned the vocational expert at the hearing, but did not inquire or question the classification of plaintiff's past work as semi-skilled. Accordingly, the ALJ's decision on Listing 12.05 is supported by substantial evidence and plaintiff's second claim of error should be denied.

### 3.    Medical Vocational Rule 201.17

In finding that plaintiff was not disabled because he could perform a significant number of sedentary jobs, the ALJ applied Grid Rule 201.20 as a framework for decision-making, which applies to a claimant who is a younger individual (ages 45-49), with a limited or less education, and who performed skilled or semi-skilled work in the past. (Tr. 28). Plaintiff argues that the ALJ should have applied Grid Rule 201.17, a rule that applied to younger persons who are illiterate or unable to communicate in English and who performed unskilled

43

work.

As discussed above, the vocational expert reviewed plaintiff's work history prior to the hearing and prepared a summary, classifying plaintiff's past work installing siding and installing gutters as SVP 4, semi-skilled.  (Tr. 245).  The expert also listened to plaintiff's hearing testimony prior to classifying plaintiff's past work as semi-skilled at the hearing.  (Tr. 69-72).  Although plaintiff's attorney questioned the vocational expert at the hearing, he did not ask any questions about the classification of plaintiff's past jobs, but rather asked the vocational expert to assume an individual with plaintiff's same age, education and work experience.  (Tr. 76-77).   Plaintiff's conclusory assertion in his brief that plaintiff's prior work was never actually performed at a semi-skilled level is wholly unsupported and without merit.  However, under 20 C.F.R. § 1565(a), a claimant who cannot use the skills acquired through their previous work is considered to have an unskilled work background.  The ALJ here did not make a finding as to whether plaintiff's skills acquired in his past work are transferable to work he is now capable of performing, concluding instead that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant had transferable skills."  (Tr. 27). However, if plaintiff is "illiterate or unable to communicate in English," as he

contends, and plaintiff is considered to have an unskilled work background based on non-transferable skills, Grid Rule 201.17 would compel a finding of disabled. Thus, if plaintiff can show that he is in fact illiterate, he would be entitled to a finding of disabled based solely on his exertional limitations.  Accordingly, the issue becomes whether plaintiff is illiterate, as he claims.

Plaintiff argues that he should have been found illiterate, asserting that the March 2009 ALJ decision "is suspect and should not be given controlling weight." (Dkt. 17, Pg ID 654).  In the March 2009 decision, the ALJ expressly considered plaintiff's allegation of illiteracy, stating:

> I have also considered the claimant's allegation of an inability to read and/or write.  The claimant graduated from high school but alleges an inability to read/write (and read 2-3 letter words).  (Exhibit 1E).  Although he testified that he was in special education, he did not make that contention in his initial application (i.e., can read and understand English and was not in special education).  The claimant's allegation of any inability to read and write is not supported given that the claimant has a driver's license and would have needed to pass a test in order to obtain his license.  I further note that the claimant did not even report this impairment at the time the application was filed.  This is despite the fact that the Disability Report specifically requests information about all conditions affecting the ability to work.  Further, there is no reference to this impairment in the medical records.  However, giving the claimant the benefit of every consideration, I have made an allowance for this impairment.

(Tr. 93).  As the Commissioner properly states, plaintiff did not challenge that

45

March 2009 ALJ decision, but instead filed a new application on May 28, 2010.

The ALJ here also addressed plaintiff's claimed illiteracy and concluded:

> The claimant alleges illiteracy. An individual is illiterate if he lacks the ability to read a simple message or write a simple message such as instructions or an inventory list (20 CFR 404.2546(b)(1) and 416.964(b)(1)). In this case, the claimant's school records show that he was able to read at the 1st grade level while in high school (7F/4). In addition, the claimant reported that he can write more than his name (3E/1) and that he completed the 12th grade (3E/3). Further, the prior ALJ decision dated March 24, 2009, found that the claimant was not illiterate and that he had a high school education (1A). The undersigned is bound by that finding absent new and material evidence (*Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997); *Dennard v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990); Acquiescence Rulings 98-3(6) and 98-4(6)). There is no new and material evidence of illiteracy in the record. The claimant still complains that he is unable to read and write, but there has been no change in that condition since the prior decision. There is certainly nothing that has happened that would make one conclude that his reading and writing ability is worse than it was at the time of the prior determination. Finally, although not a severe impairment, the residual functional capacity accounts for the claimant's alleged reading difficulties by not requiring any reading or writing as part of his work.

(Tr. 19-20).

Generally, principles of *res judicata* require that the administration be bound by a prior decision unless a change of circumstances is proven on a subsequent application. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842

46

(6th Cir. 1997). In *Drummond*, the Sixth Circuit held that Social Security

claimants and the Commissioner are barred from re-litigating issues that have

previously been determined at the administrative level. *Drummond*, 126 F.3d at

842; *see also* 42 U.S.C. § 405(h) ("The findings and decision of the Commissioner

of Social Security after a hearing shall be binding on all individuals who were

parties to such hearing."). *Drummond* mandates that absent evidence that a

claimant's condition has improved, findings issued by an ALJ as part of a prior

disability determination are binding on an ALJ in a subsequent proceeding.

*Drummond*, 126 F.3d at 841. The undersigned notes that although the ALJ here

stated that he was bound by the prior decision, it is not clear that he merely

adopted the prior finding of literacy, as he also considered the additional evidence

presented in this case–namely, plaintiff's educational records and mental health

records–in concluding that plaintiff was not illiterate. As the ALJ recognized,

plaintiff graduated from high school, but attended special education classes, and

was found upon graduation to read at the late first grade level and his overall

written language score was at a mid-second grade level. (Tr. 19, 431-32). These

test scores were consistent throughout plaintiff's school years. (Tr. 433-62). The

ALJ also noted that plaintiff can write more than his name and completed the 12th

grade. (Tr. 19-20). The ALJ further found that nothing has happened that would

make one conclude that plaintiff's reading and writing ability is worse than it was

at the time of the prior determination and that he therefore was bound by the prior

determination.  (Tr. 19-20).  While plaintiff posits in his brief that he was since

diagnosed with major depressive disorder and "[a] major depressive disorder *could*

impact [his] cognition and comprehension," (Dkt. 17, Pg ID 656), he offers no

evidence that his condition has in fact changed or worsened since the first ALJ

decision finding plaintiff literate.

According to the regulations, "[i]lliteracy means the inability to read or

write.  We consider someone illiterate if the person cannot read or write a simple

message such as instructions or inventory lists even though the person can sign his

or her name.  Generally, an illiterate person has had little or no formal schooling."

20 C.F.R. § 404.1564(b)(1).  The Seventh Circuit Court of Appeals has further

found the standard for literacy in this context to be "quite low" and has framed the

question as, essentially, "whether the applicant is so deficient in ability to read and

write that he cannot obtain even an unskilled job."  *Glenn v. Sec'y of Health &*

*Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). The undersigned notes that the

record contains evidence of both literacy and illiteracy.  Plaintiff testified that he

cannot read or write, and the record shows that he similarly reported these

limitations to mental health providers.  (Tr. 38-39, 480, 501, 551).  Although the

ALJ found that plaintiff had graduated from high school, the agency's own

regulations recognized that "the numerical grade level that you completed in

48

school may not represent your actual educational abilities." 20 C.F.R.

§ 404.1564(b).  Plaintiff attended at least two hours a day of special education

classes and it appears that reading was difficult for him, as the record provides that

plaintiff was paired with classmates for textbook work, he had much trouble

reading the textbooks, and that tests were read for him.  (Tr. 436).  Achievement

testing from plaintiff's teenage years placed him at the later first grade level in

reading.  (Tr. 431-32).

On the opposite side of the balance are several facts that suggest plaintiff

can read.  He passed a driver's test which ostensibly requires an applicant to

complete a written exam, and he continues to drive.  Plaintiff did not testify that

the exam was read to him and no evidence suggests that he passed the exam

without reading the questions on his own.  In addition, plaintiff graduated from

high school.  Although it is possible that a high school graduate could be

functionally illiterate, the more common inference is that persons with twelve

years of public education possess some ability to read.  *Cf.* 20 C.F.R.

§ 404.1564(b)(1) (noting that "[g]enerally, an illiterate person has had little or no

formal schooling"); *Range v. Soc. Sec. Admin.*, 95 Fed. Appx. 755, 757 (6th Cir.

2004) ("Although Range testified that he could not read or write, Range did have a

tenth or eleventh grade education and attended mechanics school.  He also

performed semiskilled work his entire life.  Under the regulations, Range's

49

education level and skills do not satisfy the definition of illiterate.").  Moreover,

although plaintiff has been diagnosed with a learning disorder and borderline

intellectual functioning and found to have "low reading skills," plaintiff has not

submitted any diagnosis or opinion by a medical or educational professional that

he is functionally illiterate.  (Tr. 435-37, 473, 484).  Finally, plaintiff was

employed in semi-skilled jobs for years.  *See Range*, 95 Fed. Appx. at 757; *see

also  Glenn*, 814 F.2d at 391.

        And contrary to plaintiff's assertion, the Court of Appeals for the Sixth

Circuit did not indicate in *Skinner* that a reading level at the third grade level or

below constitutes illiteracy.  Rather, the court simply reviewed one claimant's

particular case and determined that, based on the claimant's record, there was

substantial evidence to support the conclusion that the claimant was illiterate.

*Skinner*, 902 F.3d at 451 (noting that the record was "replete with evidence that

Mr. Skinner was illiterate," "includ[ing] not only reading and mathematics scores,

but also a diagnosis of illiteracy by an analyst who agreed that valid reading and

math scores at the level shown demonstrate illiteracy").  The plaintiff in that case

also testified that he only completed the third grade (in a one-room schoolhouse in

rural Mississippi).  *Id.*  The court did not indicate which types of evidence

generally support a finding of illiteracy.  Indeed, other courts have found that

individuals with reading levels below the third grade level are not functionally

illiterate. *See, e.g., Caudill v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 510, 516 (6th Cir. 2011) (finding plaintiff literate despite evidence showing he had a second-grade reading level and was diagnosed with developmental reading disorder); *Howard v. Massanari*, 255 F.3d 577, 584 (8th Cir. 2001) (plaintiff literate even though testing showed she read at a second-grade level and completed the 9th grade).

In the final analysis, although this is a close call, the administrative record contains evidence pointing to plaintiff's ability to read, and, given the deferential standard of review, the evidence is sufficient to support the ALJ's conclusion that plaintiff was functionally literate. The essential question is "whether [plaintiff] is so deficient in ability to read and write that he cannot obtain even an unskilled job," *Glenn*, 814 F.2d at 391, and not what he scored on achievement tests. *See Stewart v. Chater*, 1996 WL 153883, at *8 (N.D. Ill. Apr. 1, 1996) (noting that "while [the claimant's] reading scores on the WRAT-R may have placed him in that test's functionally illiterate classification, that does not mean he is illiterate within the meaning of the Social Security regulations"). That reasonable minds might disagree with the ALJ's conclusion does not warrant a remand because the Court will not "try the case de novo, nor resolve conflicts in the evidence." *Walters*, 127 F.3d at 528. Accordingly, the ALJ's decision is supported by substantial evidence and plaintiff's third claim of error should be denied.

51

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, that defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: February 12, 2015              s/Michael Hluchaniuk
                                     Michael Hluchaniuk
                                     United States Magistrate Judge

## CERTIFICATE OF SERVICE

    I certify that on February 12, 2015, I electronically filed the foregoing paper
with the Clerk of the Court using the ECF system, which will send electronic
notification to all counsel of record.

                                     s/Tammy Hallwood
                                     Case Manager
                                     (810) 341-7887
                                     tammy_hallwood@mied.uscourts.gov